TIGHE, TRUSTEE, et al. *v.* WALTON, et al.

No. 40814 June 2, 1958 103 So. 2d 8

*Tighe & Tighe,* Jackson, for appellants.

784

*Vardaman S. Dunn, Cecil F. Travis, Willis T. Matthews,* Jackson, for appellees.

Lee, J.

Lee Roy Walton filed his bill of complaint against Mrs. Gladys C. Whittaker and B. Stirling Tighe, Trustee, to cancel, as a cloud, their claim against the property, described in a certain deed of trust to the Deposit Guaranty Bank & Trust Company, which deed of trust had been assigned to Mrs. Whittaker, and to enjoin a foreclosure sale thereof by the trustee. In substance the bill alleged that the deed of trust was void and unenforceable because Mrs. Whittaker was one of the original grantors; that the payment, by means of which she obtained her

assignment, was the result of her own wrong doing, and should not inure to her benefit; and that the complainant was entitled to benefit from the policy of insurance which was involved. A temporary injunction was granted.

The defendants interposed demurrers; and their answer denied in detail the material allegations of the bill. By way of cross bill, they sought full payment of the indebedness claimed, together with interest, damages, and attorneys' fees.

At the final hearing on the motion to dissolve, the court cancelled the assignment to Mrs. Whittaker, together with her claim thereunder, and perpetually enjoined the defendants from foreclosing the deed of trust. From the decree entered, the defendants appealed.

The evidence, oral and documentary, disclosed the following facts:

Ray C. Whittaker and wife, Mrs. Gladys C. Whittaker, were the owners of Lot 3, Block "O", Club Park Subdivision, Part 3, in the First Judicial District of Hinds County, Mississippi, on which they had executed a first deed of trust to Kimbrough Investment Company.

Whittaker applied to the Deposit Guaranty Bank & Trust Company for a Title I, F. H. A. loan on this property in the net amount of $2,400, to run 36 months, for the purpose of adding a porch and a fireplace. The loan was approved; and, on August 16, 1955, he and his wife executed the application and the note and the deed of trust to effect the consummation of the loan. Credit life insurance was not required on such a loan; but Whittaker, following the execution of the papers, stated to the closing agent of the bank that he desired to purchase such insurance. He was thereupon directed to another officer of the bank, who was also an agent of Old Republic Credit Life Insurance Company, and such agent arranged for the insurance, with the bank as creditor beneficiary and Whittaker's estate as second beneficiary. Whittaker's

account of $11.62 in the bank was credited with $2,400, the proceeds of the loan, and on the same day, checks in the amount of $10 and $82.80, the latter being the same amount as the premium for the insurance, were charged against his account. He built neither the porch nor the fireplace.

Subsequently, the payments on both deeds of trust were in arrears. The bank reported the delinquency to the F. H. A. authorities and the trustee in the first deed of trust began foreclosure. In the meantime, the Whittakers had moved to Florida. Clarence R. Scales, an attorney, negotiated with Earl Keyes about the purchase of the property. On the day appointed for the sale, Keyes paid $262 to take care of the delinquent payments, without knowing, as he said, anything about the Title I, F. H. A. loan, and the sale was called off. Thereafter on March 15, 1956, he accepted from the Whittakers a deed in which he assumed the payment of the deed of trust to Kimbrough Investment Company, ''and subject to that certain Title One (I) loan executed by the grantors herein in favor of Deposit Guaranty Bank & Trust Company of Jackson, Mississippi.'' Although he talked to some of the F. H. A. officials, he was unable to get rid of the Title I loan. When Whittaker sold the property, he did not cancel his insurance. Keyes, however, did not even know that such insurance was in existence.

On June 4, 1956, Whittaker met his death. That occurrence, however, was unknown either to Keyes or Lee Roy Walton when, on June 8, 1956, Keyes executed and delivered to Walton a warranty deed to the property in question, in which the grantee assumed the obligation of the deed of trust to Kimbrough Investment Company ''and subject to that certain Title One (I) Loan executed in favor of Deposit Guaranty Bank & Trust Company of Jackson, Mississippi, which the grantee is now obligated to pay.''

The bank made proof of Whittaker's death, collected $2,606.20 from the insurance company, and, after pay-

ment of the amount due it, remitted the balance of $184.05 to Mrs. Whittaker and assigned to her its note and deed of trust. Thereafter Mrs. Whittaker, as the holder of the deed of trust, directed the substituted trustee to foreclose the same. Pursuant thereto, the trustee, on May 3, 1957, initiated such proceedings, and Walton applied for, and obtained, the injunction against the sale. Later, on July 12, 1957, Walton, by warranty deed, conveyed this property to Choctaw Investment Company ''subject to that certain deed of trust dated December 9, 1954, in favor of Kimbrough Investment Company'', giving the book and page number where recorded. Choctaw Investment Corporation was then permitted to intervene as a complainant on August 9, 1957.

Although the deed from Keyes to Walton clearly provided that Walton was obligated to pay the Title I loan to the bank, the court, over objection, permitted the complainants to introduce Clarence R. Scales, the scrivener, as a witness for the alleged purpose of clarifying the deed. While saying that, if he had had the chance to correct it, he would have said ''which the grantor is now not obligated to pay'', the witness could not say whether the parties told him to put ''grantor'' or '' grantee''. But he said, ''Mr. Walton was told about the Title One mortgage on the property. It was explained to him that he would have to pay the Title One to clear the title on the property * * * he knew that he had to pay it to clear the title * * *.'' And he ''was told in the presence of Mr. Keyes that he would have to pay the deed of trust to clear the property.'' Again, ''We (Scales and Keyes) sat down with Mr. Walton and told Mr. Walton that there was a second mortgage against the property, that he would have to pay the second mortgage to clear the title on the land, and it was twenty-five or twenty-six hundred dollars. He well knew that.'' In answer to the question, ''Then the language of this deed, which is Exhibit C, to Lee Roy Walton, though there may have been

some error in it, it conveyed the wishes of Mr. Earl Keyes, even in spite of any errors, didn't it?" The witness replied, "Well, I assume it does." And to the question, "I mean, you stated a while ago that Mr. Earl Keyes wanted to be sure that he didn't have to pay the ——— A. That's right. Q.—Title One Loan?" As indicating Keyes purpose to have the deed just as it was written, the following question by the trial judge and the answer of the witness thereto, are significant: "By the Court: Well, I still don't know whether it—it was your impression that, when Mr. Keyes was taking over, that he understood that in addition to assuming the first mortgage to Kimbrough, that he was also obligated to pay the second mortgage to the Deposit Guaranty Bank? A. Yes, sir, Your Honor, he was told that he had to pay." "By the Court: As a part of the consideration? A. No, sir, not as a part of the consideration. He — he was going to — Your Honor, He and Mr. Keyes discussed the fact that —Mr. Keyes told him, said, 'Now, it may be a year or two before they ever foreclose'. And he said, 'Well, maybe—or something to the effect—maybe I can buy it, or try to get a discount on it', as he had tried to do. Now, that conversation took place at that time."

Keyes, called as a witness by the complainants, testified positively that it was his understanding that Walton would pay the bank deed of trust; that he read the deed; and that he understood that Walton was to take it and to pay off the Title I loan. Walton did not testify.

. The appellees contend that Mrs. Whittaker had no absolute right of subrogation; that she and her husband, inasmuch as they did not construct the improvement for which the Title I loan was procured, actually obtained the proceeds of the loan under false representations; that a part of such money in fact paid for the premium on the credit life insurance; and that the failure of the Whittakers to enhance the value of the property, as they represented that they would do, would result in an unjust

enrichment of Mrs. Whittaker, a co-owner of the property. They also contend that parol evidence was admissible to clarify the deed.

Without dealing with the question of the admissibility of the parol evidence, it is sufficient to say that such evidence fully established the fact that Walton understood that he had to pay the Title I loan and that he agreed to pay it. That evidence fully proved that the deed provided exactly what the parties agreed to, namely, that "the grantee is now obligated to pay" the Title I loan.

The appellees cite Oxford Production Credit Association v. Bank of Oxford, 196 Miss. 50, 16 So. 2d 384, to the effect that subrogation "is not an absolute right, but depends upon the superiority of the equity of him who asserts it over the one against whom it is sought. It will never be enforced when the equities are equal. Plaintiff must show a superior equity. 'It is well settled that since the doctrine of subrogation is a creature of equity, it will not be enforced where it will work injustice to the rights of those having equal or superior equities.' "

Now, either Mrs. Whittaker or Walton (later the Choctaw Investment Corporation) is entitled to be benefited by the existence of the insurance policy. The answer turns on the determination as to which one has the higher equitable claim thereto. Looking first at the equities of Walton, it must be borne in mind that he agreed to pay the Title I loan when he bought the property. His deed so provided. Presumably he knew the value of the property, and he evidently took into consideration the existence of the bank's deed of trust at the time of the purchase of the property. To allow him to receive the benefits of the insurance policy by its discharge of the deed of trust, which he had obligated himself to pay, would certainly constitute an undeserved bounty to him. There was no legal right in him to have someone else discharge an obligation which he himself agreed to pay. Truly he would be unjustly enriched, if in fact, there is any other

person who has a legal or equitable claim to the proceeds of the policy. He did not even know that there was such a policy. Manifestly there is no equity whatsoever on his side.

On the other hand, consider the equities of Mrs. Whittaker. Now the failure of the Whittakers to use the proceeds of the loan to improve the property is of no significance. That was a matter between them and the F. H. A. Whittaker is dead, and the F. H. A., as guarantor of the bank loan, now has no liability. Moreover Walton did not rely on any representation that the proceeds from the deed of trust, which he had assumed, had been used to improve the property. An inspection thereof would have disclosed that no improvements, other than a wire fence on the back, had been recently added. When Whittaker died, his wife, a beneficiary in the policy, was entitled to the proceeds thereof, subject only to the claim of the bank to be paid therefrom. Of course the Whittakers remained liable on the note so far as the bank was concerned, and the bank had the right to the proceeds. But Walton, in the meantime, had agreed to pay the deed of trust to the bank. Under such circumstances, to deprive Mrs. Whittaker, a beneficiary, subject only to the bank's claim, of the proceeds of the policy, and to apply them in payment of Walton's obligation would be contrary to every principle of equity.

 █ This controversy must present an unparalleled situation because no case directly in point has been cited by learned counsel. Actually Keyes did not assume the payment of the bank's deed of trust, and of course did not incur any personal liability for its payment. 83 C. J. S., Subrogation, Sec. 37, p. 648. But he promptly found out about the instrument. The Whittakers had left the state. He realized that the property could be sold in satisfaction of the deed of trust and that ultimately he would be required to pay, or else lose, the property. Thus, by his deed, he made it certain that he would not be re-

sponsible for payment by requiring Walton, his grantee, to become liable therefor.

■■■ Ordinarily, the mortgagor, who pays the mortgagee, after he has conveyed the property to a grantee, who assumes the mortgage, is entitled to be subrogated to the rights of the mortgagee. 83 C. J. S., supra, p. 647.

■■■ In the same text, Sec. 44, at pp. 663-664, it is said: "One whose property is applied by others to the satisfaction of a debt or encumbrance is subrogated to the rights of the creditor or encumbrancer, and subrogation may also be allowed where funds to which one is equitably entitled has been applied to the payment of debts of another, in which case the former is subrogated to the position of the latter. *The right to subrogation is particularly appropriate where the circumstances under which the application is made results in unjust enrichment. Accordingly, the beneficiary of an insurance policy may be subrogated to the rights of a person paid from its proceeds.*" (Emphasis supplied)

■■ ■ Choctaw Investment Corporation had full knowledge of the existing controversy when it accepted the deed from Walton and intervened as a party complainant. Obviously its equity can rise no higher than that of its grantor.

■■■ Since Walton clearly assumed the payment of the deed of trust to the bank, and since Mrs. Whittaker had the higher equitable claim to the proceeds of the insurance policy, the court was manifestly wrong in decreeing the cancellation of her claim and in perpetually enjoining her and her trustee from foreclosing the deed of trust, which was duly assigned to her. Consequently the decree is reversed, and a decree will be entered here, upholding and establishing her claim, as assignee, to all rights and interests of the bank, under its deed of trust. To this end, the injunction is dissolved and cancelled and the original bill is dismissed. But in order to afford to the appellants the opportunity for the award of such

relief to which they may be entitled on account of the wrongful suing out of the injunction, the cause is remanded.

Reversed, decree here for the appellants, and remanded for the purposes stated.

*Roberds, P. J.,* and *Arrington, Ethridge* and *Gillespie, JJ.,* concur.