**BUNGE CORPORATION, Plaintiff,**

v.

**ST. LOUIS TERMINAL FIELD WARE-HOUSE COMPANY, Defendant.**

**No. GC 6516.**

United States District Court
N. D. Mississippi,
Greenville Division.

Feb. 10, 1969.

Lake, Tindall & Hunger, Greenville, Miss., for plaintiff.

Campbell, DeLong, Keady & Robertson, Greenville, Miss., Heidelberg, Woodliff & Franks, Jackson, Miss., for defendant.

## OPINION OF THE COURT

ORMA R. SMITH, District Judge.

Plaintiff, Bunge Corporation (hereinafter referred to as "Bunge"), is a New York corporation. Defendant, St. Louis Terminal Field Warehouse Company (hereinafter referred to as "St. Louis"), is a Missouri corporation qualified to do and doing business in Mississippi. This is a civil action between citizens of dif-

ferent states and the matter in controversy exceeds the sum or value of Ten Thousand Dollars ($10,000), exclusive of interest and costs; hence, this Court has jurisdiction of the action.[1]

## STANDING OF PLAINTIFF TO BRING SUIT

At the threshold the Court is faced with the question of the standing of Bunge to bring this action. At the time of the transaction involved herein, Bunge had not qualified to do business in Mississippi as required by statute.[2] This section requires a foreign corporation to secure a certificate of authority from the Secretary of State before engaging in business in the state.

■ Section 5309–239, Code of 1942, Recompiled, provides "No foreign corporation transacting business in this state without a certificate of authority shall be permitted to maintain any action, suit or proceeding in any court of this state." This prohibition applies to an action in a federal court in the state. Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524.

St. Louis does not contend that the transaction involved in this action was such as to constitute doing business in the state. The transaction, in all its aspects, was an interstate transaction and therefore exempt by law from the provisions of the statute. It is the position of St. Louis that Bunge was doing business through a wholly owned subsidiary, a Mississippi corporation known as Greenville Elevator Corporation, later known as River Grain Corp. (hereinafter referred to as "River Grain").

■ The transaction upon which the action is founded occurred in 1963. Bunge merged with River Grain in 1964 and obtained a certificate of authority at that time. This action was filed in 1965. Bunge contends that it had a right to institute the action since at the time it was filed Bunge was authorized to do business in Mississippi, and thus

the prohibition, if any existed, was removed. This question has been decided adversely to Bunge's position by the Mississippi Supreme Court. In the case of Parker v. Lin-Co. Producing Company, 1967, 197 So.2d 228, 230, the Court said:

"We hold that a foreign corporation doing business in Mississippi without having qualified as required by statute cannot use the courts of this state to enforce any cause of action that accrued as a result of doing such business. In order to avail itself of the state courts to enforce a cause of action, a foreign corporation doing business in this state must have qualified to do business when the cause of action accrued."

The issue, therefore, before the Court is whether Bunge was doing business in Mississippi at the time through River Grain, acting as its agent. To resolve this issue the Court must examine the record for pertinent facts.

The record discloses that Bunge is a wholly owned subsidiary of Los Andes, N. V., a foreign corporation of the Netherlands Antilles. The officers and directors of Bunge are not shareholders of Los Andes, N. V.

River Grain was incorporated in 1957. Its stock was held until November 30, 1961, fifty-one per cent by Bunge and forty-nine per cent by H. A. M. Corporation. On November 30, 1961 Bunge acquired the stock held by H. A. M. Corporation, thereby becoming the only stockholder of River Grain. This situation existed at the time the transaction involved in this action took place and until March, 1964, when River Grain merged into Bunge.

During the period in which H. A. M. Corporation held stock in River Grain, Bunge furnished three members and H. A. M. Corporation furnished two members of River Grain's board of directors. River Grain had five directors on its board. The directors furnished

---

1. 28 U.S.C.A. § 1332.

2. § 5309–221, Mississippi Code, 1942, Recompiled.

by Bunge, officials of Bunge, served as officers of River Grain. The two directors furnished by H. A. M. Corporation continued as directors of River Grain after Bunge acquired the stock of H. A. M. Corporation, until the latter part of March, 1963 and were on the board at the time the transaction involved in this action took place. During the critical period involved herein the officials of Bunge who were members of the River Grain's board, as executive officers of River Grain, were in charge of the affairs of River Grain.

River Grain, prior to being merged into Bunge, was a separate and distinct corporate entity. While Bunge could direct River Grain's operation because of stock ownership, River Grain had a board of directors of its own, officers who managed its affairs, and kept and maintained separate corporate records. Local managers of River Grain made operating decisions commonly exercised in connection with the facility intrusted to their care, such as pricing, hiring, personnel, etc. The individuals serving as elected officers of River Grain were also elected officials of Bunge. In their capacity as officials of River Grain they made decisions with respect to certain aspects of the operation of River Grain, i. e. financing and other corporate actions which were not a part of ordinary operations. River Grain purchased and sold grain for its own account to customers other than Bunge.

■■ The Court finds from the evidence that River Grain was a corporate entity separate and apart from Bunge; that during the period in question its association with Bunge did not act to create the relationship of principal and agent between them; and that Bunge was not engaged in doing business in Mississippi through the activities of River Grain. The Court holds that Bunge is not prohibited from bringing this action. The authorities fully support this position. 36 Am.Jur.2d, Foreign Corporations, § 347, pages 350 et seq.; Annotations, 18 A.L.R.2d, page 187; A.L.R.2d, Later Case Service, Vol.

2, supplementing 13–18 A.L.R.2d, page 1109.

The rule as stated in 36 Am.Jur. is as follows:

"The authorities in general support the proposition that a doing of business in the state by a corporation which is a subsidiary of, or is affiliated with, a foreign corporation and subject to domination and control by the latter, does not constitute a doing of business in the state by such foreign corporation if corporate separation between the two is maintained and if, with respect to the business done, the former does not stand in the relation of agent to the latter." 36 Am.Jur.2d, page 350.

\* \* \* \* \* \*

"As a rule, the mere ownership by a foreign corporation of all, or a controlling interest in, the stock of a subsidiary corporation doing business in the state does not warrant the conclusions that the business done by the latter is that of the former, and that the foreign corporation is itself doing business in the state either as, or through the agency of, the subsidiary corporation. At least so long as the subsidiary retains its own officers, has property of its own, and is responsible for its contracts and to persons with whom it deals, its corporate entity will not be disregarded in such a case." 36 Am.Jur.2d, pages 351–352.

## THE CASE ON ITS MERITS

On February 25, 1963 Bunge purchased from Mrs. Annie Lou Athens Lawshe, d/b/a Athens Grain Company (hereinafter referred to as "Lawshe"), a grain dealer in Yazoo City, Mississippi, a barge load of approximately 38,000 bushels of No. 1 yellow soybeans at a price of $2.7975 per bushel, F.O.B., Bunge's elevator at Destrehan, Louisiana. Lawshe represented to Bunge that she had a loaded barge at her grain elevator facility on the Yazoo River near Yazoo City, Mississippi, with approximately 38,000 bushels of No. 1 yellow

soybeans in bulk. This purchase was confirmed by a purchase order issued by Bunge on February 26, 1963.

On February 7, 1963 Magnolia Towing Company (hereinafter referred to as "Magnolia") of Vicksburg, Mississippi, delivered a barge at the loading dock of Lawshe at Yazoo City. On February 27, 1963 Lawshe called Magnolia and requested the issuance of a bill of lading for 38,000 bushels of soybeans for delivery to Bunge at Destrehan. Lawshe represented to Magnolia that the barge had 35,000 bushels on board and that another 3,000 would be added the next day. Melvin L. King, owner of Magnolia, inspected the barge the next day or the day after that. He refused to issue the bill of lading because the barge did not have 35,000 bushels of soybeans on it at the time. He did, however, leave a blank bill of lading with Lawshe to be filled out and forwarded to him when the barge had been loaded. On Sunday, March 3, 1963, King received a bill of lading from Lawshe which reflected a cargo of approximately 35,000 bushels of soybeans. The bill of lading was made out and signed by Lawshe, the shipper. King signed the bill of lading as carrier, carried it to Yazoo City to deliver to Lawshe, but returned to his place of business without delivering the bill of lading because he found the barge still empty. The bill of lading contained the provision "Unless otherwise indicated by endorsement hereon, the said property has been loaded by the shipper and the contents, quality, quantity, and condition of the shipment are unknown." There was no endorsement on the bill of lading.

King did not deliver the bill of lading to Lawshe, but kept it in his office until he sent it to Bunge some time after March 7, 1963.

The record shows that on February 27, 1963 Bunge called Magnolia to ascertain if Magnolia had issued a bill of lading on the barge. Again on March 4, 1963 Bunge inquired of Magnolia about the bill of lading and was informed by Magnolia's office that it had been issued.

Bunge also wanted to know when the barge would be moved. Similar inquiries were made on March 11th and 12th. On March 21st Bunge called and requested Magnolia to send a copy of the bill of lading. Ten minutes later Bunge called again to inquire about the amount of cargo reflected by the bill of lading, and was informed by Magnolia that the bill of lading called for 35,000 bushels. On March 22nd Bunge called Magnolia to know if the bill of lading had been mailed and was informed that this had been done. It appears, therefore, that the bill of lading was released to Bunge about that time. In the meantime Bunge discovered that there was a shortage in the cargo of the barge. Demand was then made by Bunge upon Magnolia to make good the shortage. Magnolia advised Bunge that the bill of lading contained a provision that the carrier did not guarantee the quantity of the shipment, and refused to make good the loss occasioned by the shortage.

King, owner of Magnolia, checked the barge on at least three occasions. He checked it when he carried the blank bill of lading to Lawshe and again after he received and signed the bill of lading. Both of these occasions are mentioned above. A short time after the barge had been moved from Lawshe's elevator, King boarded it and again checked the cargo, and found only approximately 23,000 bushels aboard.

The barge was delivered to Bunge at Destrehan on March 14, 1963 where it was checked through the facilities of the Destrehan Board of Trade and found to contain 22,572.10 bushels of soybeans.

St. Louis and Lawshe entered into a field warehousing agreement on November 8, 1960. The agreement provided that St. Louis would issue warehouse receipts on goods stored by Lawshe in grain storage tanks at Yazoo City. Under the standard warehousing arrangement Lawshe was to furnish St. Louis with adequate and proper warehouse facilities. St. Louis agreed to furnish all warehouse services and to issue warehouse receipts on grain stored in the

covered facilities. A warehouse lease was executed November 1, 1961, covering two steel tanks at Lawshe's Yazoo City elevator facilities. St. Louis was given exclusive control over these facilities. Paragraph six of the lease provides:

"It is expressly understood and agreed * * * that the Lessor (Lawshe) shall not have access to the premises herein demised or any part thereof except with the permission of the Lessee (St. Louis) in writing and that Lessor shall not exercise at any time any control of any sort of the goods against which warehouse receipts have been or shall be issued by Lessee during the term of this lease."

St. Louis appointed Mrs. Mary Sue Shipp as its agent at the Lawshe facilities. Mrs. Shipp was a nineteen year old secretary-bookkeeper employed by Lawshe. Mrs. Shipp had complete and absolute authority to issue warehouse receipts on grain stored by Lawshe in the tanks. The keys to the locks placed on the Lawshe tanks by St. Louis under the warehousing and lease agreements were kept by Mrs. Shipp. It is evident that Mrs. Shipp knew little about the nature of her duties and understood even less about the field warehousing arrangement existing between the parties. Mrs. Shipp could not see the tanks from her desk at Lawshe's office. She stated that she relied on others to see that the grain was in the tanks and that the correct amounts were transferred when this became necessary. Mrs. Shipp left the keys to the tanks in her desk, where they could be used by anyone who had access to the office when she was not present. In January of 1963, Mrs. Shipp left the regular employment of Lawshe although she remained the authorized agent of St. Louis to issue warehouse receipts. Mrs. Shipp reported to work from January through March only when Lawshe requested her to do so. During this period she visited the plant where the warehouse was located two or three times. Thus throughout this period anyone who had access to the Lawshe office also had access to the keys to the tanks held by St. Louis. It is evident that Mrs. Shipp knew little about her job and did not comprehend the importance of the warehouse receipts she issued. This is evidenced by the fact that Lawshe moved grain in and out of the storage tanks without regard to the warehouse agreement with St. Louis and consequently without regard to warehouse receipts that might be outstanding. Lawshe used the keys entrusted to Mrs. Shipp as agent of St. Louis to transfer grain from the tanks at her pleasure.

On November 8, 1962, Mrs. Shipp issued Warehouse Receipt No. A90966 for 30,000 bushels of soybeans and on January 28, 1963 she issued Warehouse Receipt No. A90969 for 45,000 bushels of soybeans. Both receipts covered soybeans stored in Lawshe's Yazoo City tanks. These warehouse receipts were issued by Lawshe as collateral to secure the payment of an obligation in the sum of $100,000 due First National Bank of Vicksburg, (hereinafter referred to as "First National" or the "bank") evidenced by two $50,000 notes.

Robert A. Carroll, field representative and district manager of St. Louis, had charge of the Lawshe contract. Carroll visited the leased facilities of Lawshe on March 5, 1963, to make an audit of the beans in the tanks against which St. Louis had the outstanding warehouse receipts aforesaid, covering 60,000 bushels of soybeans. (15,000 bushels having been released previously). Upon inspection of the two tanks Carroll found approximately 15,000 bushels in the tanks, about 14,000 bushels in one tank, and approximately 1,000 bushels in the other.

Under St. Louis' warehouse agreement the soybeans in the tanks or bins could not be released to Lawshe without permission of an agent of St. Louis—in this case Mrs. Shipp. The beans were supposed to be held until surrender of the warehouse receipts issued against them. Lawshe represented to Carroll that the 45,000 bushels of beans missing

from the tanks were loaded in the barge then situated at the facility, although the fact is that there were only 22,572.10 bushels on the barge. There was, therefore, at the time, a shortage of approximately 22,000 bushels. It is noted that Lawshe had contracted to sell Bunge 38,000 bushels, which would have consumed all beans in the tanks. It appears that Lawshe was planning to ship Bunge her entire stock, and Carroll's visit thwarted her plans. Lawshe informed Carroll that she would secure the release of the beans from the receipts held by First National by paying it the sum of $87,000, which she had available, and by making a note for the balance of the debt. As hereinafter stated, Lawshe had persuaded Bunge to advance $87,000 against the shipment of beans, being approximately 90% of the purchase price. Carroll did not inspect the beans on the barge and made no effort to verify Lawshe's statement that there were 45,-000 bushels aboard.

Several days prior to March 5th, Lawshe began trying to induce Bunge to make an advance against the shipment. The evidence shows that such practice is commonplace in the industry when the shipment starts its journey to the purchaser.

On March 4th, Bunge determined that a bill of lading had been made to cover a shipment of 35,000 bushels of beans, and on March 5th, at Lawshe's instance made an advance against the purchase and wired First National the sum of $87,000, for the account of Lawshe. This money was made available to First National on March 5th, but was received by it after banking hours. The beans did not leave Lawshe's elevator until March 7th.

In the afternoon of March 6th, Carroll went to the Vicksburg office of First National. He had in his possession a withdrawal record, or release, for the two warehouse receipts aforesaid. This document had been signed by Mrs. Lawshe and it was his intention to have First National sign it. He also carried a receipt that day issued for 6,000 bushels of beans.

The president of First National refused to complete the transaction without the presence of Mrs. Lawshe. Carroll waited at the bank until Mrs. Lawshe could come from Yazoo City. The transaction was closed by applying $87,000 advanced by Bunge to the two $50,000 notes and the execution by Mrs. Lawshe of a note for the balance of $13,-000 to secure the payment of which note Carroll delivered to the bank the warehouse receipts for 6,000 bushels of beans. The bank executed the withdrawal record and surrendered the two warehouse receipts for 60,000 bushels of beans which the bank held as security for the payment of the two $50,000 notes. It will be noted here that St. Louis' liability to First National created by the shortage of the beans was discharged in part by the application of Bunge's $87,-000.

The Court holds that Lawshe obtained the advance of $87,000 from Bunge by falsely and fraudulently representing to Bunge that the barge of beans purchased by Bunge contained 35,000 bushels of No. 1 yellow soybeans, when in fact the barge contained only 22,572.10 bushels of sample grade yellow soybeans.

Before acting upon this false and fraudulent representation, Bunge was assured by Magnolia that a bill of lading covering 35,000 bushels of soybeans had been made. The evidence shows that at the time this information was received, the bill of lading had been signed by Lawshe, the shipper, and Magnolia, the carrier. These circumstances enabled Lawshe to secure an advance of $87,000 from Bunge, and to effect the release of the warehouse receipts issued by St. Louis.

It is apparent from the record in this case and the Court so finds that St. Louis was negligent in performing the duties created by its contract with Lawshe and by law in connection with the operation of the warehouse on the

premises leased from Lawshe; that St. Louis permitted Lawshe to withdraw beans from storage at her pleasure, and that such negligence set the stage for Lawshe's fraud on Bunge.

Bunge filed suit in the Circuit Court of Yazoo County, State of Mississippi, against Lawshe and recovered judgment for the sum of $31,467.31. Bunge has not been able to collect the judgment. The record shows that the judgment is not collectible and is worthless.

Bunge brought this action on March 10, 1965 seeking to recoup its loss from St. Louis. Bunge claims that Lawshe obtained the advance of $87,000 as the result of false and fraudulent representations; that the money so obtained was used to effect the release of the two warehouse receipts issued by St. Louis, and upon which St. Louis had an outstanding liability because of the shortage in the beans represented by the receipts; that the shortage was made possible by the negligent failure of St. Louis to perform its duty with regard to the storage of the beans; and that St. Louis was unjustly enriched by the transaction to the extent of Bunge's loss, to-wit, $31,467.31. Bunge claims that it is entitled to be subrogated to the rights held by First National in and to the receipts aforesaid.

### FINDINGS OF FACT

The Court finds and adjudges that the facts set forth in the foregoing summary of the case are true and are supported by the evidence.

■ It follows, therefore, and the court so finds that Lawshe through false and fraudulently representations enduced Bunge to advance her the sum of $87,000; that the money so advanced was used by Lawshe to discharge the liability of St. Louis to First National on the warehouse receipts aforesaid; that St. Louis negligently permitted Lawshe to withdraw from the tanks in which the beans were stored, 45,000 bushels of the 60,000 bushels covered by the receipts; and that St. Louis was unjustly enriched

by the amount of Bunge's loss, to-wit, $31,467.31.

### CONCLUSIONS OF LAW

■ In American Fidelity and Casualty Co. v. United States Fidelity and Guaranty Co., (5 Cir. 1962), 305 F.2d 633, 635, it is said:

"The doctrine of subrogation is pure equity, having foundation in principles of natural justice. It rests, not on contract, but on the natural principals of right and justice, when applied to the facts of the particular case, and includes every instance in which one who is not a volunteer pays the debt of another."

■ Also, in Texas Co. v. Miller, (5 Cir. 1947), 165 F.2d 111, 116, it is stated:

"We do not have here a case of conventional subrogation but of legal subrogation that arises by operation of law. 'Subrogation arises by operation of law where a person has been compelled to pay off a prior encumbrance in order to protect himself, *or where he has paid the debt of another in such circumstances that equity will afford him the security or obligation held by the creditor whose claim has been paid'*." (Emphasis supplied).

■ In 83 C.J.S. Subrogation § 7, Page 599, it is said:

"Subrogation has been said to involve three elements, that is, a valuable right, a person who owns the right, and a person who is seeking to be substituted to that ownership."

■ Also, in the same authority, at page 600, it is said:

"It is generally held that subrogation will be applied wherever a person not acting voluntarily, but under some compulsion, pays a debt or discharges an obligation for which another is primarily liable and which in equity and good conscience ought to be discharged by the latter."

And at page 603, the text continues:

"One induced by fraud to pay another's debt is not a mere volunteer and may obtain subrogation."

The Court finds these legal principles to be applicable to the facts in this case. They have been accepted by the Mississippi Supreme Court. Robert G. Bruce Co. v. Spears, 1939, 187 Miss. 405, 187 So. 756; Tighe v. Walton, 1958, 233 Miss. 781, 103 So.2d 8; Box v. Early, 1938, 181 Miss. 19, 178 So. 793; Home Owners' Loan Corp. v. Moore, 1939, 184 Miss. 283, 185 So. 253; Sadler v. Glenn, 1940, 190 Miss. 112, 199 So. 305; Oxford Production Credit Ass'n v. Bank of Oxford, 1944, 196 Miss. 50, 16 So.2d 384; Kellner v. Kellner, 1961, 241 Miss. 53, 129 So.2d 391; Prestridge v. Lazar, 1923, 132 Miss. 168, 95 So. 837. Respectful authority from other jurisdictions gives support to the principles. Wilson v. Todd, 1940, 217 Ind. 183, 26 N.E.2d 1003, 129 A.L.R. 192; First Taxing District v. Gregory et al., 1922, 97 Conn. 639, 118 A. 96, 26 A.L.R. 297; Pittsburg-Westmoreland Coal Co. v. Kerr, 1917, 220 N.Y. 137, 115 N.E. 465.

In the case at bar there are three parties involved. First National held St. Louis' warehouse receipts for 60,000 bushels of grain, and to that extent was the creditor of St. Louis. St. Louis was obligated by its receipts to produce the beans covered thereby. Bunge, the third party, advanced funds, which were obtained by the fraud of Lawshe. These funds were used by Lawshe to satisfy the obligation of St. Louis to First National.

St. Louis contends that it is an innocent party; that it did not participate in Lawshe's fraud; that Bunge negligently elected to advance the funds to Lawshe, for which it should not be made to suffer.

The record shows that Bunge's action in making the advance to Lawshe was in line with a common practice of the industry, and that the advance was not made until Bunge had assurances from Magnolia that a bill of lading had been issued on the barge for 35,000 bushels of beans. The Court finds that Bunge exercised reasonable care to determine that a barge with 35,000 bushels of beans aboard had been delivered to the carrier by Lawshe for shipment to it. The only other precaution Bunge could have taken would have been to personally check the barge in order to verify the information which had been given to it by the carrier.

Lawshe's conduct was false and fraudulent. She falsely represented to Bunge that she shipped to it a barge with 35,000 bushels of No. 1 yellow soybeans aboard. This was not true.

St. Louis was negligent in operating the warehouse. As a result of this negligence Lawshe was permitted to remove beans at her pleasure. St. Louis compounded its negligence when on March 5th Carroll, its agent, discovered the shortage and did not act promptly to have the beans on the barge returned to the tanks, or, at least, to determine the amount of beans on board the barge. If Carroll had exercised due care, he would have discovered a shortage of approximately 22,000 bushels.

On March 1st, four days before Carroll's visit, St. Louis issued its inventory report to Lawshe and First National, by which it certified that there were 15,000 bushels of beans, of the value of $34,500, held in the warehouse pursuant to Receipt No. A90966, and there were 45,000 bushels of beans, of the value of $103,500, held there pursuant to Receipt No. A90969. These beans were valued on this report at $2.30 per bushel. St. Louis' actual loss, or liability on its receipts held by First National, on March 5th, stood at $50,600. (22,000 bushels at $2.30 per bushel).

Carroll faced with the bean shortage elected to join and assist Lawshe in securing a release from First National. A reasonable inference from the evidence is that Carroll had knowledge of the sale to Bunge and also knew that Lawshe was securing the advance of $87,000, which she intended to use to secure a release for St. Louis. If Carroll had acted

promptly, and demanded the return of the beans on the barge to the warehouse he would have determined that the 22,-000 bushels of the beans had been withdrawn by Mrs. Lawshe without right to do so. If this care had been taken it is apparent that Bunge would not have been defrauded. Carroll's conduct enabled Lawshe to consummate the fraud.

By pursuing the course which he followed, Carroll was able to save St. Louis from its apparent loss. The negligence of St. Louis, so to speak, set the stage for Lawshe's fraud.

The Court finds that the equities of Bunge are superior to those of St. Louis and Bunge must, therefore, prevail in this suit.

St. Louis contends, however, that Bunge is a volunteer and, therefore, cannot claim subrogation. Of all the principles involved in this area, it is clear that subrogation is not available to a volunteer. See American Fidelity & Casualty Co. v. United States Fidelity & Guaranty Co., supra; Box v. Early, supra; Union Mortgage, Banking & Trust Co. v. Peters, 1895, 72 Miss. 1058, 18 So. 497, 30 L.R.A. 829, and 83 C.J.S. subrogation § 9, page 601. The difficulty comes in determining who fits into this category. Union Mortgage, Banking & Trust Co. v. Peters, supra; Love v. Robinson, 1931, 161 Miss. 585, 137 So. 499, 78 A.L.R. 608.

The Court has determined that Bunge was not a volunteer or an intermeddler under the facts of this case. Bunge became involved in this affair because of fraud of Lawshe; brought about and to a great extent made possible by the negligence of St. Louis. Defendant cites McDaniel Bros. Construction Co. v. Burk Hallman Co., 1965, 253 Miss. 417, 175 So.2d 603, to sustain its contention that Bunge was a volunteer and is not entitled to subrogation rights. The decision in this case supports the proposition that a party who is induced by fraud to pay the debt of another cannot be classified as a volunteer. The Court said:

"The question is whether a prime contractor, who voluntarily pays the assignee of a subcontractor a sum of money in excess of what said assignee could have recovered if it had sued the prime contractor, may recover said excess from the assignee when said payment was made by the prime contractor *without compulsion, fraud, mistake of fact*, or promise on the part of the assignee to repay the excess. We hold that such voluntary payment may not be recovered (Emphasis supplied)." 175 So.2d at 604.

St. Louis contends also that Bunge has no right of action against it under the Mississippi Statutes governing warehouse receipts.[3]

Since the right of subrogation rests independent of the statutes and the facts do not involve this issue, this defense can be dismissed.

St. Louis advances the defense of election of remedies, contending that Bunge elected its remedy when it proceeded against Lawshe.

This doctrine is only applicable where there exists two or more remedies, each inconsistent with the other, and a choice has been made to proceed under one of them.

In 28 C.J.S. Election of Remedies § 8, page 1073, it is held:

"Where remedies pursued against different persons are repugnant and inconsistent, the election of one bars the other, but concurrent and consistent remedies may all be pursued until satisfaction is had."

The remedy of Bunge against Lawshe was founded on a breach of her contract with Bunge to ship it 35,000 bushels of No. 1 yellow beans. The actual shipment was not of that quantity or quality, hence giving rise to Bunge's claim.

---

3. Sections 5019, 5020 and 5021, Mississippi Code, 1942 Recompiled.

The remedy of Bunge against St. Louis is based upon the premise that Bunge's money, unlawfully and fraududently obtained, was appropriated by St. Louis to discharge its liability and obligation to First National.

These remedies are not inconsistent or repugnant, but are consistent with each other and can be pursued concurrently.

 Next, St. Louis contends that Bunge's action is barred by laches. For this doctrine to apply, two elements must be present—an inexcusable delay and a change of position by defendant, 30a C.J.S. Equity § 117, page 65. Neither of these are present in this case.

The record shows that Bunge demanded payment from St. Louis on March 29th. An action was started in the United States District Court for the Southern District of Mississippi, on July 3, 1964, and this action was started on March 10, 1965. There has been no change in the position of St. Louis. All of Lawshe's assets were pledged to First National as security for the payment of a debt in excess of the value of the security, and Lawshe was judgment proof. St. Louis could not have been injured by any delay of Bunge in asserting its claim.

St. Louis pleads the Mississippi statute of frauds,[4] and a statute of limitations.[5] The Court finds neither of these to be applicable to the facts in this case.

Other defenses asserted by St. Louis are found to be without merit.

Bunge's complaint is one in equity and prays for an order subrogating it to the rights of First National in and to the receipts in question, and directing that the receipts be revived, reissued and delivered to it, to be redeemed by St. Louis for the sum of $31,467.31.

The record reflects that the warehouse in question is no longer under the control of St. Louis and the beans covered by the receipts are not in existence. Such an order, except as to the redemption of the receipts would be of little value. The Court is of the opinion that the end results of the action will be accomplished by the entry of a judgment in Bunge's favor for the amount of its demand.

Accordingly, an appropriate judgment will be entered by the Clerk, in favor of Bunge and against St. Louis for the sum of $31,467.31, to bear interest at six per cent per annum from the date of the judgment until paid. St. Louis is to be taxed with the costs.

---

4. Section 264, Miss.Code 1942, Recompiled.

5. Section 720, Miss.Code 1942, Recompiled.