613 So.2d 829 (1993)
George WILLIAMS, Executor of the Estate of Charles M. Williams, Deceased; George Williams, Individually, and Mary Williams
v.
Joe Sam OWEN and Hancock Bank.
No. 07-CA-59661.
Supreme Court of Mississippi.
January 28, 1993.
*830 Floyd J. Logan, Logan & Keith, Gulfport, for appellants.
Wynn E. Clark, Owen Galloway & Clark, Joe Sam Owen, D. Knox White, White & Morse, Gulfport, William V. Westbrook, III, Eaton & Cottrell, Gulfport, for appellees.
En banc.
DAN M. LEE, Presiding Justice, for the Court:
As modified by en banc consideration on the Court's own motion on January 21, 1993: This is an appeal from a judgment entered by the Harrison County Circuit Court, First Judicial District, based upon a complaint for declaratory judgment filed by the Hancock Bank. The bank was named as primary beneficiary for "business loan" in a life insurance policy owned by the deceased, Charles M. Williams. During the course of his life and at the time of his death, Mr. Williams had both individual, business loans and partnership loans with Hancock Bank, and a dispute arose between Mr. Williams' business partner, Joe Sam Owen, and Mr. Williams' parents, George and Mary Williams, contingent beneficiaries, regarding the bank's application of the insurance proceeds to satisfy the outstanding debts of the deceased. Consequently, Hancock Bank filed the complaint for declaratory judgment to have the court declare the rights of all interested parties with respect to the proper application of the insurance proceeds.
A hearing was held on July 12-13, 1988, by the late James Arden Barnett, who was appointed Special Chancellor to hear this case. At the close of two days of testimony, Chancellor Barnett entered a brief bench opinion wherein he found that in designating as beneficiary the "Hancock Bank (Business Loan)," Mr. Williams intended that his life insurance proceeds were to be used to satisfy partnership, as well as individual business debts. The court entered a judgment based on the bench opinion, and an appeal was taken to this Court by George and Mary Williams, individually, and by George Williams as the executor of his son's estate.
After careful study of the issues, we find merit in the appellant's argument that the lower court erred in not requiring Mr. Williams' business partner, Joe Sam Owen, to contribute to the satisfaction of the partnership debts. Therefore, we reverse the judgment entered in the court below and order contribution in the amount stated in this opinion.

FACTS
The facts of this case are voluminous, yet crucial to a complete understanding of the legal issues which we consider today. In a case such as this, there is simply no substitute for a generous review of the facts which have brought us this far. For simplicity, the facts will be presented in a narrative form closely tracking the chronological order of key events.
Charles Williams (hereinafter "Charles") was a young man from the Mississippi Gulf Coast in the real estate business as a developer, appraiser, and property manager. Charles held a degree from the University of Southern Mississippi in real estate, and he held a real estate broker's license. At one time, Charles was also an agent with Nationwide Insurance Company; however, it appears from the record that he was not active in the insurance business for very long.
Some of Charles' business projects in real estate were solo ventures where he worked alone in financing and developing property. However, at some point in late 1977, Charles formed a partnership with his first cousin, Joe Sam Owen (hereinafter "Owen"), a Gulfport attorney, to build a *831 night club on the beach in Gulfport on Highway 90. Although Charles and Owen never entered into a partnership agreement, there is no dispute that they were, indeed, business partners on the beach club venture. The first step in the project was to acquire financing. Therefore, on October 26, 1977, Charles and Owen borrowed $250,000.00 from the Hancock Bank (hereinafter "bank"). Both Charles and Owen signed a promissory note as co-makers, jointly and severally liable for the repayment of the loan. The $250,000.00 loan was used to purchase a piece of beach front property and to construct the building. For security, the bank required a deed of trust on the property and building and a $5000.00 savings account which Owen pledged. The bank did not require either partner, Charles or Owen, to acquire a credit life insurance policy as a condition for the loan.
On January 16, 1978, approximately three months after the first partnership note was executed, Charles voluntarily purchased a term life insurance policy from Nationwide Insurance Company. The face value of the policy was $200,000.00, with an accidental death rider for an additional $100,000.00. Charles named the "Hancock Bank (Business Loan)" as the primary beneficiary, and his parents, George and Mary Williams, were designated as contingent beneficiaries. Charles' father, George Williams, appellant here, was the procuring agent for Nationwide. When Charles purchased the policy in January of 1978, he was a young man at the age of twenty-six. In the fall and winter of 1977-78, construction on the beach club progressed, but the $250,000.00 loan proved insufficient to complete the construction of the building. Therefore, on April 20, 1978, Charles and Owen borrowed an additional $50,000.00 from the bank to complete the project. Again, Charles and Owen signed a promissory note as co-makers, jointly and severally liable for repayment. No additional security was required by the bank, and the second loan was secured by the original deed of trust. Construction of the building was eventually completed, and the club opened for business as the Shy Anne Social Club.
On March 27, 1981, Charles re-applied and was re-issued the Nationwide policy. The terms of the 1981 policy were the same as the 1978 policy. The only reason that Charles re-applied and was re-issued the policy was to take advantage of a more favorable premium rate structure that was available in March of 1981. Again, Charles named "Hancock Bank (Business Loan)" as primary beneficiary and his parents, George and/or Mary Williams as contingent beneficiaries. In March of 1981, when the policy was re-issued, Charles was twenty-nine years old, and his father was again the procuring agent for Nationwide. At all times, Charles made the life insurance premium payments from his personal checking account. The record contains copies of cancelled checks. Most of the checks bear simply the notation of the policy number. However, on a few of the drafts that he wrote, Charles used the notation, "credit life ins." or "credit life," on the memo line for the check.
In 1984, Charles executed a will in which he devised his interest in the beach club land and building to his mother, Mary Williams. In June of 1986, Charles, individually, borrowed $48,000.00 from the bank for a solo project which did not involve the partnership. George Williams testified that his son borrowed this money to develop some housing, but Charles' death intervened. This brings us to the next significant event in these facts. Charles died approximately four months later on October 24, 1986.
In the month following Charles' death, November 1986, Nationwide Insurance Company contacted the Hancock Bank and informed Sal Domino, Vice-President, that the bank was the beneficiary on a $200, 000.00/$300,000.00 policy which Charles had owned. This contact by the insurance company was when the bank learned, for the first time, that Charles Williams had designated the bank as his life insurance beneficiary. Nationwide requested that the bank inform them in writing of the total amount that Charles *832 Williams owed the bank at the time of his death. Sal Domino advised Nationwide that, "[a]t the time of Mr. Williams death he was indebted to the bank in the principal amount of $246,161.56." This amount of $246,161.56 includes the remaining debt on the two Williams-Owen notes plus the one outstanding debt that Charles incurred in June of 1986.[1] On December 11, 1986, Nationwide sent a check to the Hancock Bank in the amount of $200,252.86:
This check represents a face value of $200,000.00; premium refund of $252.85. Please be advised we are holding the Accidental Death Benefit pending further investigation. Once a decision has been made you will be informed.
After additional investigation, Nationwide honored the $100,000.00 accidental death coverage; and, on February 12, 1987, Nationwide forwarded another check to the bank in the amount of $46,908.70. Both checks from Nationwide to the bank, $200,252.86 and $46,908.70, were enough to satisfy Charles' debts to the bank, individual and partnership.[2] Even after the bank had been paid, there remained $53,091.30 from the $300,000.00 policy. Therefore, Nationwide paid $53,091.30[3] to Charles' parents, the contingent beneficiaries.
It was at this point, when the checks were being distributed by Nationwide, that the waters began to muddy. Unbeknown to Owen, George and Mary Williams approached Sal Domino at the bank and began negotiations for an agreement. The upshot of the agreement was a commitment from the bank to delay, for a period of time, the application of the bank's beneficiary proceeds to the Williams-Owen partnership notes. George and Mary Williams thought that if the entire Owen-Williams debt was satisfied from the Nationwide proceeds, then Joe Sam Owen would be the real beneficiary, at their expense and detriment. As contingent beneficiaries, George and Mary Williams were entitled to all remaining sums which the bank would not use to extinguish Charles' debts. As a matter of equity, the sum and substance of their objective was to have Owen contribute one half (1/2) to the satisfaction of the partnership debts, rather than using the insurance proceeds to satisfy the entire partnership debt.
The agreement was executed by the bank and George and Mary Williams on February 23, 1987. It is important to understand that at this time, February 1987, and at all times, the bank's position was that it had an absolute right to apply all of the insurance proceeds received by it for the satisfaction of all of Charles' debts, partnership debts included. For lack of a better term, the bank felt that it had no "legal need" for an agreement with the contingent beneficiaries, George and Mary Williams. However, Leo Seal, Jr., bank president, and Sal Domino, vice-president, both testified that the Williams had been good friends with the bank for many years, and there was a long-standing relationship between the family and the bank. Understandably, the bank was also sympathetic to their tragic plight at this time since their son had recently died. Consequently, the bank agreed to hold off, temporarily, on the application of the proceeds to the partnership debts. The bank did immediately satisfy Charles Williams' individual debt which was $49,132.27. The substance of the agreement was that the bank complied with the Williams' request to delay satisfaction of the Owen-Williams partnership debts until May 1, 1987. In the meantime, the balance of the insurance proceeds held *833 by the bank, $151,120.59, was deposited in an interest bearing escrow account under the name of George Williams. In the agreement, the bank stated that it retained full control over the disposition of the funds deposited into the account including the right to apply the full amount to the repayment of the partnership notes, but the bank promised not to exercise this right until after May 1, 1987. However, the bank stated that it could, with the agreement of both parties, extend the grace period beyond the May 1, 1987, deadline without relinquishing any rights.
During this time that the Williams-Bank agreement was being negotiated and executed, Owen was unaware that Charles had named the bank as his life insurance beneficiary and that insurance proceeds existed. It also follows that Owen was unaware that a Williams-Bank agreement existed. George Williams, as executor, opened his son's estate for probate. Then, Owen filed a petition with Charles' estate seeking contribution from the estate to keep the partnership notes with the bank current so that the club could continue to operate until Charles' estate affairs were settled. The record indicates that at least by March of 1986, prior to Charles' death in October, the club was struggling financially. The record also reflects that in October of 1986, when Charles died, Charles and Owen were in default on both partnership notes.[4]
After the probate of Charles' estate was in full swing, Owen learned for the first time: (1) that Charles had a $300,000.00 life insurance policy; (2) that Hancock Bank was the named beneficiary; (3) that the bank was holding the proceeds in escrow; (4) that the bank had entered into some type of an agreement with the Williams which pertained to the funds in escrow. In sum, Owen learned much in a short period of time. The details of Owen's "revelation" are not completely divulged in the record, except for the fact that it was during an in-chambers meeting with Chancellor Floyd when some of this information surfaced for Owen's consumption. As a response to Owen's petition seeking contribution from Charles' estate, the estate sought an order from the court directing Owen to sell the club and property within sixty (60) days so that money would be available to pay off the partnership debts. Owen accused the Williams of attempting to force a sale of the property to satisfy the partnership notes while keeping secret the existence of the insurance money held in escrow at the bank.
As of the time of trial in July of 1988, the club building had been vacant for several months. However, the value of the property was estimated to be approximately $350,000.00 to $475,000.00. The monthly note to the bank on the partnership debts was $3000.00. Owen testified that he and Charles had paid approximately $290,000.00 in principal and interest on the notes since they were executed in late 1977 and early 1978.
Procedurally, the appeal which has reached this Court began as follows. Hancock Bank filed a complaint for declaratory judgment on July 8, 1987, naming Joe Sam Owen, George Williams as Charles Williams' executor, and George and Mary Williams, individually, as defendants. The complaint asked that the court declare the rights, status and legal relationships of all parties consistent with the rights of the bank under the promissory notes, the deed of trust, and the insurance proceeds held by the bank in escrow. Owen answered and counterclaimed against the bank seeking a judgment directing the bank to apply, in full, the insurance proceeds together with accrued interest to the partnership notes for full satisfaction and discharge of the notes and deed of trust.
The Williams answered seeking various forms of suggested relief. First, the Williams denied that the bank had the right to apply any of the insurance proceeds to the partnership debts, averring that the bank had the right to satisfy only individual debts of Charles Williams. Second, the answer requested that if the court determined that the proceeds were applicable to *834 the partnership debt, that only the proceeds necessary to satisfy 50% of the partnership debt be applied.[5] Third, if the court applied any portion of the proceeds to the partnership debt, that the court order the bank to assign to the Williams the deed of trust and promissory notes held by the bank, or, impose an equitable lien against the partnership property.
The bank answered the pleadings filed by both Owen and the Williams. Then, Owen filed a counterclaim against the bank seeking application of the proceeds for complete satisfaction of the partnership debts alleging tortious interference of business rights by the bank. Owen also cross-claimed against George and Mary Williams averring wrongful, intentional, and concealed abatement of insurance monies and intentional injurious falsehoods to seek economic gain.
Owen's cross-claim against the Williams was bifurcated by order entered in June of 1988, and this portion of the litigation was transferred to the Harrison County Circuit Court. However, a hearing was held on the issues in this appeal on July 12-13, 1988. At the conclusion of two days of testimony and some 50 exhibits, Chancellor Barnett issued a very brief bench ruling which was favorable to Owen. The chancellor found that Charles Williams intended to benefit the partnership when he voluntarily acquired the insurance policy and named the bank as beneficiary pro tanto.
Following the bench ruling, a final judgment was entered in this case on July 25, 1988, reciting the chancellor's findings of fact and conclusions of law. The final judgment declared that the joint and several partnership notes of Charles Williams and Joe Sam Owen be fully paid and satisfied along with a release of the deed of trust and the $5000.00 savings account which was pledged by Owen. Furthermore, an equitable adjustment on the assessment of interest was required. The chancellor ruled that the partnership notes were to be satisfied as of the date that the bank received the insurance proceeds. As noted earlier in the facts, the bank placed the proceeds in an interest bearing escrow account, but the interest accumulation in escrow was insufficient to cover the interest charged on the partnership notes. Therefore, this difference was charged to George and Mary Williams.[6] The final judgment denied any right of contribution, subrogation, or assignment by the Williams against Owen.
During the time that this appeal was pending before this Court, certain events occurred which affect the posture of the appeal as we find it. Mary Williams, mother of Charles Williams, purchased from Owen his one-half (1/2) interest in the property. Mrs. Williams is now the fee simple owner of the property having acquired the remaining one-half (1/2) interest via her son's will. Additionally, the Hancock Bank followed the directive of the lower court. The bank applied the insurance proceeds to the partnership notes and cancelled the deed of trust. This fact was confirmed at oral argument by all parties. Therefore, the bank no longer has a viable interest in this appeal since all of its interests have been satisfied.
Consequently, the post-trial events narrow the issue which we consider today. Namely, we consider whether the lower court should have ordered contribution from Owen for the satisfaction of the partnership debts.

ANALYSIS
In deciding the question which this appeal presents, we employ nothing which is complex or foreign to the law as we understand it. In the truest sense, the result which we reach is rooted in pure equity, nothing more or less.
It is fundamental that general partners are jointly and severally liable for partnership debts. Cone Mills Corp. v. Hurdle, 369 F. Supp. 426, 438 (N.D.Miss. 1974); Houston General Ins. Co. v. Maples, 375 So.2d 1012, 1016 (Miss. 1979); *835 Shemper v. Hancock Bank, 206 Miss. 775, 779, 40 So.2d 742, 744 (1949); Bank of Morton v. Etheridge & Hardee, 112 Miss. 208, 216, 72 So. 902, 903 (1916); see Miss. Code Ann. § 79-12-29 (1972) ("All partners are liable jointly and severally for all debts and obligations of the partnership including those under sections 79-12-25 and 79-12-27."). There is also a rebuttable presumption that all co-makers of a note are liable for an equal share of a debt, even though each is liable for the full amount under joint and several liability. White and Summers, Uniform Commercial Code § 13-6 (3d ed. 1988).
It is equally clear that the right of contribution exists among partners where one or more partners has paid more than his allocable share of a partnership debt:
The principle is too well established to require the citation of authority to the effect that the liability of partners is joint and several, each partner being liable for all of the partnership debts with the right of contribution from the other members of the partnership.

Shemper v. Hancock Bank, 206 Miss. 775, 779, 40 So.2d 742, 744 (1949). (emphasis added).
The right of contribution among co-makers of a note is the same as that which exists among partners. "When one co-maker pays the instrument he is entitled to contribution from other co-makers." White and Summers, § 13-6 at 636. The right of contribution between co-makers is equitable in nature and rests upon an implied contract of reimbursement among co-makers and not upon the instrument which was discharged. 11 Am.Jur.2d Bills and Notes § 588 (1963).
As noted in Celotex Corp. v. Campbell Roofing & Metal Works, Inc., 352 So.2d 1316, 1319 (Miss. 1977), in earlier times the doctrine of contribution was enforced only in courts of equity. Later, courts of law assumed jurisdiction, and it is settled that an action at law will lie on the theory of implied contract of reimbursement. Celotex, 352 So.2d at 1319. Celotex recognized and enforced the doctrine of contribution as between joint judgment debtors. In applying the doctrine, this Court noted that contribution is allowed at common law if the action is considered contractual, and by statute if the action is one of tort. Celotex, 352 So.2d at 1319. Common law contribution exists for those with a common liability. Nichols v. Anderson, 837 F.2d 1372, 1377 (5th Cir.1988).
The doctrine of contribution requires that persons having a common liability, such as the joint and several judgment against Campbell and Celotex, bear their individual share of the burden imposed and not have any one of them carry the full load. The general rule of common law is that one who is compelled to satisfy, or pay more than his just share of such common burden or obligation, is entitled to contribution from the others to obtain from them payment of their respective shares.
Celotex Corp. v. Campbell Roofing & Metal Works, Inc., 352 So.2d 1316, 1318 (Miss. 1977).
Contribution is purely an equitable remedy. Nichols v. Anderson, 837 F.2d 1372, 1377 (5th Cir.1988). Its aim is the prevention of injustice, pure and simple. DeFoe v. Great Southern National Bank, 511 So.2d 912, 914 (Miss. 1987).
In the past, we have not hesitated to require contribution where one of two parties has inequitably shouldered the burden for a common liability. See Celotex Corp. v. Campbell Roofing & Metal Works, Inc., 352 So.2d 1316, 1318 (Miss. 1977); Comfort Engineering Company, Inc. v. Kinsey, 523 So.2d 1019, 1021-22 (Miss. 1988); see also Nichols v. Anderson, 837 F.2d 1372, 1377 (5th Cir.1988). After a thoughtful review of the facts in this case, we find compelling equitable considerations which favor the appellants, and few which favor Owen.
Eight years prior to his death, Charles Williams purchased a $200,000.00 life insurance policy with a $100,000.00 accidental death rider, designating "Hancock Bank (Business Loan)" as primary beneficiary. This was strictly a voluntary act since *836 there was no requirement from the bank which prompted Charles to obtain the policy. For eight years, Charles made the premium payments from his personal checking account,[7] yet he never even informed his business partner that he had procured such insurance. It likewise follows that Charles had never discussed with Owen the need to obtain a reciprocal policy to serve their joint interests. In the event of one partner's untimely death, the bank was not relying upon the existence of insurance proceeds to secure its interest. Instead, the bank was looking to partnership assets. The same can be stated with regard to Owen. Owen never had any reason to look for insurance funds to pay off the debts which he jointly owed to the bank in the event his partner met an untimely death.
Both Charles and Owen were liable for the partnership debts, and both gentlemen contracted to pay the full amount of both notes. An undeserved bounty would inure to Owen if the debts were fully extinguished due to events far removed from his realm of influence. Basic fairness dictates that Owen shoulder one-half (1/2) of the amount which he had contracted to pay.
We find the case at bar similar to that which existed in Tighe v. Walton, 233 Miss. 781, 103 So.2d 8 (1958). In the Tighe case, Walton bought a house with the understanding that he would have to pay off a Title I deed of trust in order to acquire an unencumbered title, and Walton took this into consideration when he negotiated for the purchase price of the property. As events unfolded, it was learned that the original homeowner had voluntarily purchased a credit life policy to cover the Title I home improvement loan. The original homeowner named the creditor as primary beneficiary, and when he died the insurance proceeds were available for application to the loan. A controversy ensued between Walton and the surviving widow who was named as contingent beneficiary. Tighe, 233 Miss. at 789, 103 So.2d at 10-11. In evaluating the equities, this Court found that the surviving widow was in a far superior position, and much of what was stated there is appropriate in the instant case:
To allow him [Walton] to receive the benefits of the insurance policy by its discharge of the deed of trust, which he had obligated himself to pay, would certainly constitute an undeserved bounty to him. There was no legal right in him to have someone else discharge an obligation which he himself agreed to pay. Truly he would be unjustly enriched, if in fact, there is any other person who has a legal or equitable claim to the proceeds of the policy. He did not even know that there was such a policy. Manifestly there is no equity whatever on his side.
Tighe v. Walton, 233 Miss. 781, 791-92, 103 So.2d 8, 12 (1958).
This record reflects that the bank received insurance proceeds in the total amount of $247,161.56. From this amount, Charles' individual debt of $49,132.27 was satisfied, leaving an outstanding partnership debt in the amount of $198,029.29. One-half of the partnership debt is $99,015.00, and we order contribution from Joe Sam Owen to the Estate of Charles M. Williams in that amount[8], which sum is subject to distribution by the Estate of Charles M. Williams of $49,507.50 to George Williams and $49,507.50 to Mary Williams. Regarding the interest deficiency in the amount of $5,492.39, which was charged to George and Mary Williams, we have considered the equities of that charge, and we leave that part of the final judgment *837 undisturbed.[9]
AFFIRMED IN PART; REVERSED AND RENDERED IN PART. THE INTEREST DEFICIENCY IN THE AMOUNT OF $5,492.39 (PLUS ACCRUING INTEREST AT 8% PER ANNUM) WHICH WAS CHARGED TO GEORGE AND MARY WILLIAMS IS AFFIRMED. JUDGMENT ENTERED HERE FOR GEORGE WILLIAMS, AS EXECUTOR FOR THE ESTATE OF CHARLES M. WILLIAMS AGAINST JOE SAM OWEN IN THE AMOUNT OF $99,015.00. REMANDED FOR FURTHER ACTION AS TO INTEREST AND DISTRIBUTION CONSISTENT WITH THIS OPINION. JOE SAM OWEN, APPELLEE, IS TAXED WITH ALL COSTS OF THIS APPEAL.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN and BANKS, JJ., concur.
McRAE, J., concurs in result only.
ROBERTS and SMITH, JJ., not participating according to internal Supreme Court rules.
NOTES
[1] Regarding the Williams-Owen partnership notes, the outstanding balances as of May 1, 1986, were $169,545.72 from the first note of $250,000.00, and $33,361.02 from the second note of $50,000.00.
[2] On December 18, 1986, the bank received $200,252.86 in insurance proceeds. On February 16, 1987, the bank received the second check for $46,908.70. Therefore, the bank received a total of $247,161.56 to satisfy in full the individual and partnership debts of Charles Williams. In December of 1986, the bank informed the insurance company that it would require $246,161.56 to satisfy all debts. There is no apparent explanation from the record concerning Nationwide's payment of an additional $1000.00 above request.
[3] Two separate checks were issued to George Williams and to Mary Williams in the amount of $26,545.65 each for a total of $53,091.30.
[4] The last payment was made in September, 1986. The next payment was due on October 1, 1986. October 1 passed with no payment. Charles died on October 24, 1986.
[5] Fifty percent (50%) representing Charles' one-half (1/2) partnership interest.
[6] The deficiency amounted to $5,492.39.
[7] Over an eight year period, it appears that Charles paid in a total of $4,569.87 in premium payments.
[8] One-half of the partnership debt, rounded to the nearest dollar, is $99,015.00. The Court is aware that the insurance proceeds were received in two payments approximately two months apart. Furthermore, the amount which is necessary to extinguish a debt can change from day to day depending upon terms which govern the rate of interest charged. The Court has taken this into consideration in determining from this record the amount of contribution which we order. The Court is satisfied that this amount accomplishes our objective of doing equity between the parties.
[9] This amount represents an interest deficiency. The amount of interest charged on the partnership notes was more than the interest earned on the insurance proceeds escrow account at the bank. At the time the judgment was entered, the deficiency was $5,492.39. Since the interest deficiency continued to accumulate each day that the partnership debts remained unsatisfied, at the instance of and benefit to the Williams, the judgment required George and Mary Williams to pay $5,492.39, plus any additional amounts owed, until such time the bank utilized the escrow funds to extinguish the debts. Whatever amount the Williams' paid for the interest deficiency, we find that equity demands affirmance.